MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2026 ME 88
Docket:        Oxf-25-310
Argued:        March 5, 2026
Decided:       August 13, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

## STATE OF MAINE

v.

## JAMES PETERS

STANFILL, C.J.

[¶1] James Peters appeals from a judgment of conviction of endangering the welfare of a dependent person (Class C), 17-A M.R.S. § 555(1)(B) (2026), entered by the trial court (Oxford County, *Woodman, J.*) after a jury trial. Peters argues that (1) the court erred in denying his motion to dismiss[1] for lack of a corpus delicti; (2) there was insufficient evidence to prove beyond a reasonable doubt that he had assumed a legal duty of care for the victim; and (3) the court abused its discretion by admitting in evidence photographs of the victim in the hospital shortly before her death. We affirm the judgment.

---

[1] A motion to dismiss is not a proper procedure for litigating a corpus delicti claim, but in this case, we construe Peters's motion to dismiss as a motion for a judgment of acquittal. *See infra* ¶¶ 22, 24 & n.7.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the verdict, *see, e.g.*, *State v. Kilgore*, 2025 ME 81, ¶ 3, 345 A.3d 48, the jury rationally could have found the following facts.[2]

[¶3]  Peters met the victim in South Portland around 2015; Peters was in his early sixties, and the victim was in her late seventies.  The victim had previously lived in a house in Mexico, Maine, but after her spouse died in 2012, she moved into a South Portland apartment owned by her son, one of her two children.  While living in South Portland, the victim stopped driving, and she relied on family members for transportation and groceries.

[¶4]  In 2016, the victim moved back into the Mexico house with Peters, who considered himself to be the victim's fiancé.  From 2016 to 2021, Peters and the victim spent nearly all of their time together.  Neither Peters nor the victim ever had visitors at the house, and Peters did all the driving and shopping.

---

[2] We note that neither the statement of facts nor the argument sections of Peters's briefs contain any citations to the record, and we remind counsel that a statement of facts must include "citations to the pages in the appendix, transcript, or record that support each fact."  M.R. App. P. 7A(a)(1)(D). Contrary to Peters's suggestions at oral argument, "[i]t is the duty of counsel to refer us to the portion of the record supporting [an appellant's] contentions," and "[i]t is neither practical nor appropriate for us to comb the record on [the appellant's] behalf."  *People v. Smith*, 347 P.3d 530, 552 (Cal. 2015) (quotation marks omitted); *see also State v. Hanson*, 483 A.2d 723, 725 (Me. 1984) ("[F]actual assertions in [a] brief are not suitable substitutes for a record.").

[¶5] After the victim returned to Mexico, she did not see either of her children again. For the first several years, the victim's daughter called her on the phone once or twice a week, but beginning in 2020, the daughter's calls all went to voicemail. The daughter then communicated with the victim over email, but at some point, Peters started replying to the daughter's emails, ostensibly on the victim's behalf. Between October 2020 and February 2021, the daughter made at least six attempts to visit the victim at the house in Mexico. Each time, the daughter honked her car horn and knocked on the front door, but no one ever came out of the house.

[¶6] The victim fell while using the bathroom in late December 2020 and sustained injuries that left her unable to move herself. Over the following weeks, Peters occasionally carried her between her bed and a chair in the living room, but she did not move on her own at all. The victim's lack of movement caused ulcers and infections to develop on multiple parts of her body, including on her face, ears, torso, and legs. These wounds went untreated and several of them developed necrosis, which caused the tissues of the victim's body to die and rot. In January 2021, a necrotic wound on the victim's face caused about a quarter of her jawbone to break off and a hole to form through one of her

cheeks, exposing the internal structures of her face and leaving her unable to ingest anything.

[¶7] The victim's fall and the subsequent complications also caused a significant deterioration in her mental faculties. By mid-January 2021, she was incontinent, unable to speak, and more or less unresponsive

[¶8] Throughout this period, Peters was—and considered himself to be—the victim's sole caretaker. After the victim's fall, Peters initially brought her food, but once the hole in her cheek made ingestion impossible, he told her to dip her fingers in water and wipe them on her lips. By mid-January 2021, Peters believed that the victim was dying, but he decided not to seek medical care.

[¶9] It was not until February 10, 2021, that Peters called 9-1-1 and requested medical assistance for the victim. When the first responders arrived, they found the victim lying in her bed, covered in dried urine and feces. There was a foul odor coming off her body, and it was evident that she had not been washed in weeks. The victim was barely conscious, and other than groaning and pulling away from touch, she was unalert and unresponsive.

[¶10] The first responders transported the victim to a local hospital, where a physician observed that she was "clearly unwell" and "in a state of total

neglect." While the victim was being cleaned and examined, she whispered "help me" to one of the nurses, but she was otherwise unable to speak to anyone at the hospital. The hospital staff feared that the victim was experiencing sepsis, and they arranged for her to be airlifted to Maine Medical Center. When the victim arrived at Maine Medical Center, she was photographed by a Maine State Police officer.

[¶11] The victim died on February 12, 2021, two days after Peters called 9-1-1. The cause of her death was hypertension and atherosclerotic cardiovascular disease, and sepsis was a contributing factor. In addition to the visible wounds described above, eight of the victim's ribs were broken, and her brain showed signs of significant atrophy. Neglect contributed to her condition and death.

[¶12] On March 11, 2021, the State filed a criminal complaint charging Peters with a single count of endangering the welfare of a dependent person, 17-A M.R.S. § 555(1)(B). The next month, an Oxford County Grand Jury returned an indictment charging Peters with the same single count. *See* 17-A M.R.S. § 9(1) (2026); M.R.U. Crim. P. 7(a). Peters pleaded not guilty at his arraignment on October 1, 2021.

6

[¶13]  After a series of delays related to the COVID-19 pandemic, Peters filed a motion in limine on February 14, 2025, to exclude "all photographs of the alleged victim."  In a chambers conference before trial, the court expressed its intention to admit certain photographs and exclude certain others.

[¶14]  The court held a four-day jury trial beginning on March 10, 2025. The witnesses for the State included the victim's children, the 9-1-1 dispatcher who fielded Peters's call, several of the medical professionals who treated the victim, several of the investigating police officers, and the state medical examiner.  A number of the State's exhibits were also admitted in evidence, including several photographs of the victim at Maine Medical Center, photographs of the victim's house taken shortly after she was hospitalized, and audio recordings of police interviews with Peters on February 11 and 23, 2021. The sole witness for Peters was an expert in forensic nursing.

[¶15]  At the close of the State's case-in-chief, Peters moved to dismiss the indictment for lack of a corpus delicti.  The court, after hearing arguments from the parties, denied the motion.

[¶16]  The jury returned a guilty verdict on March 13, 2025.  Peters timely moved for a new trial, raising various arguments not relevant to this appeal.  On June 20, 2025, the court denied the motion for a new trial and sentenced Peters

to five years of incarceration, partially suspended, followed by two years of probation.  Peters timely appealed.  *See* M.R. App. P. 2B(b)(1).

## II. DISCUSSION

### A.    Corpus Delicti

[¶17]  Peters first argues that the court erred by denying his motion to dismiss for lack of a corpus delicti.

[¶18]  The Latin phrase corpus delicti translates to "body of the crime." *Corpus Delicti*, Black's Law Dictionary (12th ed. 2024).  The phrase is sometimes used "[i]n popular language" to "describe the visible evidence of [a] crime, such as the dead body of a murdered person," but as a legal doctrine, it refers to the "principle that a crime must be proved to have occurred before anyone can be convicted for having committed it."  *Id.* (quotation marks omitted); *see, e.g.*, *State v. Levesque*, 146 Me. 351, 356, 81 A.2d 665, 668 (1951) ("[B]efore there can be a lawful conviction of a crime, the corpus delicti—that is, that the crime charged has been committed by some one—must be proved." (quotation marks omitted)); *State v. Terrio*, 98 Me. 17, 20, 56 A. 217, 219 (1903) (explaining that the corpus delicti of a murder was not "in controversy" because there was no dispute "that [the victim] came to his death by violence and criminal agency").

8

[¶19]  The "corpus delicti rule" was developed in the common law to "prevent the possibility of a conviction for a crime that never actually occurred." *State v. Fundalewicz*, 2012 ME 107, ¶ 8, 49 A.3d 1277.  The rule is defined differently across jurisdictions, but Maine's version of the rule requires the State to "produce, exclusive of any confession or admission of the defendant, such credible evidence as will create a substantial belief that the crime charged has been committed by some person."[3]  *State v. York*, 1997 ME 209, ¶ 8, 704 A.2d 324 (quoting *State v. Curlew*, 459 A.2d 160, 165 (Me. 1983)); *accord, e.g., State v. Hagar*, 2019 ME 97, ¶ 23, 210 A.3d 827.  *See generally Corpus Delicti Rule*, Black's Law Dictionary; Samuel A. Thumma & Roger E. Brodman, *On

---

[3]  Maine's version of the corpus delicti rule hews closely to what was developed and applied at common law.  *See, e.g.*, 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.4(b) (3d ed.), Westlaw (database updated Oct. 2025); Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. Pa. L. Rev. 638, 656 nn.101-02 (1955) (collecting cases).  For the purposes of federal law, the U.S. Supreme Court has replaced the common-law version of the rule with a "more flexible 'trustworthiness' approach."  *United States v. Abu Ali*, 528 F.3d 210, 235 (4th Cir. 2008).  Under the federal rule, a corpus delicti may be established not only by independent evidence of the corpus delicti itself but also by evidence that "tend[s] to establish the trustworthiness of the [inculpatory] statement[s]."  *Opper v. United States*, 348 U.S. 84, 93 (1954); *accord Smith v. United States*, 348 U.S. 147, 156 (1954) ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.").  Some states have followed the federal lead and eschewed the traditional rule in favor of a trustworthiness standard, *e.g.*, *State v. Bishop*, 431 S.W.3d 22, 45-61 (Tenn. 2014); *People v. LaRosa*, 293 P.3d 567, 571-78 (Colo. 2013), while others have not, *e.g., Miller v. State*, 457 S.W.3d 919, 921-27 (Tex. Crim. App. 2015); *State v. Ray*, 926 P.2d 904, 906 (Wash. 1996); *People v. McMahan*, 548 N.W.2d 199, 201 & n.7 (Mich. 1996); *see also Commonwealth v. Forde*, 466 N.E.2d 510, 513 (Mass. 1984) (adopting the traditional rule for the first time); *State v. Holl*, 966 N.W.2d 803, 809-14 (Minn. 2021) (interpreting a state statute as codifying the traditional rule).  We have previously declined to depart from the traditional rule, *State v. Hagar*, 2019 ME 97, ¶¶ 1 & n.2, 21 & n.9, 210 A.3d 827; *see State v. Curlew*, 459 A.2d 160, 164-65 & nn.8-9 (Me. 1983), and neither party has asked us to change course here.

*"Vague Latin Phrases" and Criminal Confessions: Corpus Delicti, Trustworthiness and Corroboration, and the Federal Rules of Evidence*, 114 J. Crim. L. & Criminology 105, 107-14 (2024); David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 826-31 (2003); Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession*, 103 U. Pa. L. Rev. 638, 638-49 (1955).

[¶20]  Most jurisdictions treat the corpus delicti rule as either (a) a rule of evidence that governs the admissibility of a defendant's statements or (b) a substantive element of the State's proof that must be met in order for a conviction to be sustained.  *See, e.g.*, 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.4(b) (3d ed.), Westlaw (database updated Oct. 2025) (describing the "evidentiary foundation" and "implicit element" approaches to the corpus delicti rule).  Our precedents, however, indicate that Maine is one of the several jurisdictions in which the rule contains *both* an evidentiary component and a substantive component.[4]  *E.g.*, *York*, 1997 ME 209, ¶ 3 n.3, 704 A.2d 324; *State v. Cruz*, 594 A.2d 1082, 1084-85 (Me. 1991); *State v. Libby*, 546 A.2d 444, 450-51

---

[4] Although we have, in recent decisions, described Maine's corpus delicti rule primarily in terms of its evidentiary component, *see Hagar*, 2019 ME 97, ¶ 22-23, 210 A.3d 827; *State v. Poulin*, 2016 ME 40, ¶¶ 8-9, 134 A.3d 886, we have never suggested that the substantive component has been supplanted, and neither party to this case has asserted as much.  We are therefore satisfied that Maine's corpus delicti rule continues to contain both a substantive and an evidentiary component. *Cf. Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶ 23, 914 A.2d 1116 (explaining, with respect to statutory interpretation, that "the common law is not to be changed by doubtful implication" (quotation marks omitted)).

(Me. 1988); *Curlew*, 459 A.2d at 162-65; *see also, e.g.*, *State v. Leniart*, 215 A.3d 1104, 1113-20 (Conn. 2019) (concluding that Connecticut's corpus delicti rule is "a hybrid rule that not only governs the admissibility of confession evidence but also imposes a substantive requirement"); *State v. Cardenas-Flores*, 401 P.3d 19, 23-30 (Wash. 2017) (reaffirming that Washington's corpus delicti rule is "both a rule of admissibility and a rule of sufficiency" (quotation marks omitted)); *People v. Gonzalez*, 499 P.3d 282, 293 n.3 (Cal. 2021) (explaining that a state statute abrogated only the evidentiary component, and not the substantive component, of California's corpus delicti rule).

[¶21] The evidentiary component of Maine's corpus delicti rule pertains to the admissibility of a defendant's statements: "before a defendant's self-inculpatory out-of-court statement may be admitted in evidence and considered by the fact-finder, the State must present sufficient credible evidence to create a substantial belief that the crime charged has been committed by some person." *Fundalewicz*, 2012 ME 107, ¶ 8, 49 A.3d 1277 (footnote and quotation marks omitted); *accord, e.g.*, *State v. Poulin*, 2016 ME 40, ¶¶ 8-9, 134 A.3d 886; *State v. Knight*, 2002 ME 35, ¶ 11, 791 A.2d 110; *see State v. Wardwell*, 158 Me. 307, 320-21, 183 A.2d 896, 904 (1962). A motion in limine and an objection at trial to the admission of the defendant's statements

are both proper vehicles to test whether the State has presented sufficient credible evidence to create that substantial belief.[5] *See, e.g.*, *Poulin*, 2016 ME 40, ¶ 6, 134 A.3d 886; *Knight*, 2002 ME 35, ¶ 9, 791 A.2d 110; *State v. Anglin*, 2000 ME 89, ¶ 6, 751 A.2d 1007.

[¶22] Substantively, the corpus delicti rule reflects an "implicit element" of the State's proof: if the evidence in the record, excluding any statements of the defendant, does not create a substantial belief that the crime was committed by someone, then the defendant must be acquitted.[6] *E.g.*, *York*, 1997

---

[5] Because the evidentiary component reflects a "foundational requirement for the admissibility of evidence," the "question of whether or not the corpus delicti has been established . . . is a preliminary question for the court under [M.R. Evid.] 104." *Poulin*, 2016 ME 40, ¶¶ 9-10, 134 A.3d 886 (quotation marks omitted). In resolving that question, the court is "'not bound by the rules of evidence'" and may "properly consider inadmissible evidence in determining whether the State has met its corpus delicti burden." *Id.* ¶ 10 (quotation marks omitted). Moreover—and notwithstanding our "strong preference for proof of [a] corpus delicti prior to admitting evidence of a defendant's confession or admission," *Knight*, 2002 ME 35, ¶ 12, 791 A.2d 110 (quotation marks omitted)—we have recognized that a court may admit a statement *de bene* and condition its final admission on the subsequent presentation of independent evidence sufficient to establish the corpus delicti, *see, e.g.*, *id.* ¶¶ 12-13 (citing M.R. Evid. 611(a)); *Poulin*, 2016 ME 40, ¶¶ 6, 10, 134 A.3d 886; *State v. Anglin*, 2000 ME 89, ¶¶ 6, 9, 751 A.2d 1007; *Curlew*, 459 A.2d at 162-64.

[6] Some of our older decisions describe the substantive component as consisting of "two separate standards": "First, independent of any post-crime admissions or confessions made by defendant, the State must have proved the corpus delicti to a probable cause standard, i.e., the State must have proved the basis for a substantial belief therein. Then, the State must also have established the corpus delicti beyond a reasonable doubt considering the entire evidence, including any post-crime admissions or confessions made by defendant." *Libby*, 546 A.2d at 451 (italics and footnote omitted); *accord, e.g.*, *York*, 1997 ME 209, ¶ 8, 704 A.2d 324; *Curlew*, 459 A.2d at 164. However, as our more recent decisions have recognized, the second of those standards is "really redundant of the sufficiency of the evidence standard of review that applies in any criminal case." *Knight*, 2002 ME 35, ¶ 12 n.4, 791 A.2d 110; *accord Anglin*, 2000 ME 89, ¶ 9 n.3, 751 A.2d 1007; *see, e.g.*, *State v. Kendall*, 2016 ME 147, ¶ 12, 148 A.3d 1230. Thus, we see no benefit in continuing to characterize that standard as a part of the corpus delicti rule, and we clarify that the substantive component of the corpus delicti rule consists of the single standard outlined in the main text above.

ME 209, ¶ 8, 704 A.2d 324; *State v. Powers*, 609 A.2d 1167, 1170 (Me. 1992);

*Libby*, 546 A.2d at 450-51; *Curlew*, 459 A.2d at 164-65; *Levesque*, 146 Me. at

354-59, 81 A.2d at 667-69; *see also* 1 Wayne R. LaFave, *Substantive Criminal*

*Law* § 1.4(b) (describing the "implicit element" approach to the corpus delicti

rule). A substantive corpus delicti claim should be raised through a motion for

a judgment of acquittal. *See, e.g.*, *York*, 1997 ME 209, ¶¶ 3-4 & n.3, 8, 704

A.2d 324; *Libby*, 546 A.2d at 450-51; *Curlew*, 459 A.2d at 164.

[¶23] With respect to either component of Maine's corpus delicti rule,

the "'substantial belief' standard of proof is a low one." *Fundalewicz*, 2012 ME

107, ¶ 9, 49 A.3d 1277. "A substantial belief that a crime was committed exists

where the facts and circumstances within the knowledge of the factfinder

would warrant a prudent and cautious person to believe that the crime was

committed by someone." *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886 (quotation

marks omitted); *see also, e.g.*, *State v. Reed*, 676 A.2d 479, 481 (Me. 1996) ("'[A]

substantial belief' is not 'beyond a reasonable doubt.' It is not even to the level

of a 'fair preponderance of the evidence'; rather, the degree of proof required

resembles the probable cause standard." (quotation marks omitted)).

[¶24] Peters's motion to dismiss asserted that the charges against him

could not be sustained because the State had failed to establish a corpus delicti,

and the trial court adjudicated his claim on those grounds. We thus construe his motion to dismiss as a motion for a judgment of acquittal,[7] *see, e.g.*, *State v. Landry*, 428 A.2d 1204, 1206 n.2 (Me. 1981), and on that basis, we treat his substantive corpus delicti claim as preserved, *see, e.g.*, *York*, 1997 ME 209, ¶ 3 n.3, 704 A.2d 324; *Libby*, 546 A.2d at 450-51. Accordingly, we review the court's factual findings for clear error and review de novo whether those facts were sufficient, exclusive of Peters's statements, to create a substantial belief that the crime of endangering the welfare of a dependent person was committed by someone. *See, e.g.*, *Fundalewicz*, 2012 ME 107, ¶ 10, 49 A.3d 1277; *State v. Michaud*, 1998 ME 251, ¶ 7, 724 A.2d 1222; *Reed*, 676 A.2d at 481-82.

[¶25] Under 17-A M.R.S. § 555(1)(B), a person is guilty of endangering the welfare of a dependent person if "[t]he person intentionally or knowingly endangers the health, safety or mental welfare of a dependent person." The statute defines "dependent person" as someone "who is wholly or partially dependent upon one or more other persons for care or support because the person suffers from a significant limitation in mobility, vision, hearing or mental functioning or is unable to perform self-care because of advanced age

---

[7] Because an indictment may not be dismissed based on the sufficiency of the State's evidence, *see, e.g.*, *State v. Storer*, 583 A.2d 1016, 1020-21 (Me. 1990), a motion to dismiss is not a proper vehicle for litigating a corpus delicti claim.

14

or physical or mental disease, disorder or defect." *Id.* § 555(2)(B). The statute also provides that the "endangerment" element may be satisfied by a failure to act if "the defendant has a legal duty to protect the health, safety or mental welfare of the dependent person" and that "a legal duty may be inferred if the defendant has assumed responsibility in whole or in part for the care of the dependent person." *Id.* § 555(2)(A).

[¶26] To meet its corpus delicti burden in this case, the State needed to present sufficient evidence, exclusive of Peters's statements, to create a substantial belief that the victim was a dependent person and that someone "endanger[ed]" her.[8] *See id.* § 555(1)(B); *Hagar*, 2019 ME 97, ¶ 24, 210 A.3d 827; *York*, 1997 ME 209, ¶¶ 8-10, 704 A.2d 324; *Curlew*, 459 A.2d at 165; *Levesque*, 146 Me. at 355-56, 81 A.2d at 668. The trial court reasoned that the State met its burden because it presented sufficient independent evidence to establish that (1) the victim was a dependent person who was unable to perform self-care, (2) Peters had assumed a legal duty of care for her, and (3)

---

[8] To the extent that Peters argues that the State was required to establish a particular mens rea as part of its corpus delicti burden, his argument is misguided. The corpus delicti rule requires the State to establish that a crime occurred because of criminal agency—rather than, for example, natural causes—but it does not require the State to establish any particular mens rea. *See, e.g.*, *Hagar*, 2019 ME 97, ¶ 24, 210 A.3d 827; *State v. Anderson*, 409 A.2d 1290, 1300-01 (Me. 1979); *Terrio*, 98 Me. at 20, 56 A. at 219.

Peters had endangered her by failing to seek medical care as her condition worsened.[9] We agree, and we briefly address each of those conclusions in turn.

[¶27]  First, the testimony of the first responder and other medical professionals was sufficient to establish that the victim was "unable to perform self-care because of advanced age or physical or mental disease, disorder or defect." *See* 17-A M.R.S. § 555(2)(B).  According to that testimony, the first responders found the victim covered in dried feces and urine, with a foul odor coming off her body; it appeared as though she had not been washed "in weeks." The victim was incontinent, unable to communicate, and more or less unresponsive.  Because a person in such a condition obviously cannot perform self-care, the State met its corpus delicti burden with respect to the victim's status as a dependent person.  *See id.*; *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886.

[¶28]  Next, there was also sufficient evidence to establish that Peters owed the victim a legal duty of care.  Specifically, the State presented sufficient independent evidence to establish that Peters had been living with the victim

---

[9]  Formally, the State could have satisfied its corpus delicti burden by establishing that *someone* had a legal duty of care to the dependent victim and that *that person* endangered her.  *See, e.g., Hagar*, 2019 ME 97, ¶ 24, 210 A.3d 827.  But the State's evidence focused exclusively on Peters, and there was no evidence that anyone other than Peters could have committed the crime.  Thus, for the ease of the reader, we describe the State's burden, and the evidence it presented to meet that burden, with reference to Peters rather than a generic "someone."  *See, e.g., Fundalewicz*, 2012 ME 107, ¶¶ 10-13 & n.3, 49 A.3d 1277.

16

and had assumed responsibility, at least "in part," for her care.  *See* 17-A M.R.S. § 555(2)(A).  That evidence included the following:

- Testimony of the victim's son that, even before the victim moved to Mexico with Peters, her family drove her to medical appointments and did her grocery shopping because she did not drive;

- Testimony of the victim's children that Peters and the victim had moved to Mexico together;

- Testimony of the victim's daughter that although the victim did not drive, there was a car in the victim's driveway when the daughter tried to visit;

- Testimony that Peters called 9-1-1 and was the only other person at the house when the first responders arrived;

- Photographs of two cell phones in the victim's living room;

- Testimony and photographs indicating that, despite the victim's condition, someone had been keeping the house relatively clean and tidy; and

- Photographs of the house showing indicia of caretaking, such as gloves and wipes in the victim's bedroom, towels placed between the mattress and sheets in the victim's bed, and soiled linens on the back porch.

Peters argues that this evidence did not establish with *certainty* that he had assumed responsibility for the victim's care.  The substantial-belief standard, however, requires far less than certainty.  *See, e.g.*, *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886.  Because the State's evidence was sufficient to permit an inference that Peters had assumed responsibility, at least in part, for the victim's care, the State met its corpus delicti burden with respect to the

existence of a duty. *See* 17-A M.R.S. § 555(2)(A); *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886.

[¶29]   Finally, the State presented sufficient evidence independent of Peters's statements to establish that Peters "endangered" the victim by failing to seek earlier medical intervention. *See* 17-A M.R.S. § 555(1)(B), (2)(A). The testimony of the first responder and medical professionals indicated that the victim's infections and necrotic wounds had developed at least several weeks before her hospitalization and that the severity of the victim's condition would have been evident to a layperson. The photographs of the victim in the hospital corroborated that testimony; the victim's body was covered in sores, infections, and bruises, and the hole in her cheek was visible from several feet away. Because this evidence indicated that the victim had been in obvious need of medical assistance for some time before Peters called 9-1-1, it was sufficient to establish that Peters had endangered the victim by failing to take earlier action.[10]   *See id.*; *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886.

---

[10]   Peters asserts that there was insufficient evidence to prove that he *caused* the victim's injuries or death. But the State was not required to establish that Peters caused the victim harm; it was required to establish only that he "endanger[ed]" her. 17-A M.R.S. § 555(1)(B); *see, e.g.*, *State v. Hodgson*, 2025 ME 88, ¶¶ 30-31, 345 A.3d 125. And because the State established that Peters owed the victim a legal duty of care, it could establish that he endangered her either by causing a risk of harm *or* by failing to prevent such a risk from materializing. *See* 17-A M.R.S. § 555(2)(A).

18

[¶30]  In sum, the State presented sufficient evidence, exclusive of Peters's statements to the police, to create a substantial belief that the victim was a dependent person and that Peters endangered her by failing to seek care as her condition deteriorated.  Thus, the State carried its corpus delicti burden with respect to the crime of endangering the welfare of a dependent person, and the court did not err in denying Peters's motion to "dismiss."  *See* 17-A M.R.S. § 555(1)(B), (2)(A)-(B); *Poulin*, 2016 ME 40, ¶ 12, 134 A.3d 886; *York*, 1997 ME 209, ¶¶ 8-10, 704 A.2d 324.

## B.    Sufficiency of the Evidence; Existence of a Legal Duty

[¶31]  Peters also argues that, apart from any issues with the corpus delicti, there was insufficient evidence in the record to prove beyond a reasonable doubt that he had assumed a legal duty of care for the victim. Viewing the evidence in the light most favorable to the jury's verdict, *see, e.g.*, *State v. Edwards*, 2024 ME 55, ¶ 17, 320 A.3d 387, we disagree.[11]

---

[11]  Although we review unpreserved challenges to the sufficiency of the evidence "under the standard of review applicable to preserved error," *State v. Kendall*, 2016 ME 147, ¶ 12, 148 A.3d 1230, we note that Peters may have *waived* his sufficiency challenge by stating, at the close of the State's case-in-chief, that he was "not making a Rule 29 motion" because "especially under the extremely low burden that we're dealing with, the State at least gets past a [motion for a] judgment of acquittal," *cf., e.g.*, *State v. Schooley*, 2025 ME 84, ¶ 17, 345 A.3d 78 (explaining that we will not review a trial court's jury instructions if the appellant "openly acquiesced to the instructions at trial").  We need not determine whether Peters's claim is waived, however, because it is unpersuasive in any event.

[¶32]  As noted above, section 555 provides that a legal duty of care "may be inferred if the defendant has assumed responsibility in whole or in part for the care of the dependent person."  17-A M.R.S. § 555(2)(A).  Here, the victim was clearly a dependent person, and there was ample evidence that Peters had assumed responsibility, at least in part, for her care.  In his interviews with the police, Peters described the various steps he had taken to care for the victim, affirmed that he had been her "sole caretaker," and explained that he had cared for her because she "didn't have anybody" else.  More specifically, he stated that after the victim became immobile, he had carried her around the house and brought her food and water, and that after she became incontinent and unable to communicate, he had been "in charge" of trying to keep her clean.  These statements, which were corroborated by the testimony of the victim's children, the medical professionals, and the investigating officers, permitted the jury to find that Peters had assumed at least partial responsibility for the victim's care.[12]

---

[12] In the face of this and other evidence, Peters makes a policy-based argument against "[t]reating [his] acts of compassion as evidence of assumed legal duty."  But that argument—regardless of its merits—is one for the Legislature, not the courts.  *See, e.g.*, *State v. Fantastic Fair*, 158 Me. 450, 467, 186 A.2d 352, 363 (1962) ("Whether the enactment of [a] law is wise or not, and whether it is the best means to achieve the desired result are matters for the Legislature and not for the court[s]." (quotation marks omitted)).

[¶33]   Because the evidence was sufficient to find that Peters had assumed responsibility, at least in part, for the care of the dependent victim, it was sufficient to prove that Peters had assumed a legal duty of care.[13]  *See id.*; *Edwards*, 2024 ME 55, ¶ 17, 320 A.3d 387.

## C.   Admission in Evidence of Photographs of the Victim

[¶34]   Finally, Peters argues that the court abused its discretion by admitting in evidence several photographs of the victim in the hospital.  Again, we disagree.

[¶35]  Under M.R. Evid. 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice."  For a court to sustain a Rule 403 objection, "the evidence must have an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one."  *State v. Aldrich*, 2026 ME 8, ¶ 26, 353 A.3d 987 (quotation marks omitted).  As we recently reiterated, "A gruesome photograph of a victim's body may be admitted provided that its probative value outweighs the danger of unfair prejudice.  The critical factor in this

---

[13] Peters has not developed any other sufficiency-of-the-evidence claims for appellate review, *see, e.g.*, *Mehlhorn v. Derby*, 2006 ME 110, ¶ 11 & n.6, 905 A.2d 290, and our cursory review of the record indicates that the evidence was sufficient for the jury to find each element of the offense beyond a reasonable doubt, *see, e.g.*, *Edwards*, 2024 ME 55, ¶ 17, 320 A.3d 387.

balancing test is the significance of the photograph in proving the State's case." *Id.* (quotation marks omitted).

[¶36]  Here, the photographs were quite significant to proving the State's case.  The State's theory at trial was that the victim had been dependent on Peters, that the decline in her health had been evident, and that Peters violated the law by failing to seek care.  Peters's primary theory of defense was that "until the very end," he had not realized the extent of the victim's decline, and that the ailments described by the medical professionals would not have been detectable to a layperson.  The photographs were thus critical to the jury's evaluation of Peters's defense—i.e., of whether it was plausible that Peters had not recognized the severity of the victim's condition and had not known that she needed medical care.[14]  *See, e.g.*, *State v. Crocker*, 435 A.2d 58, 76 (Me. 1981) ("The pictures conveyed relevant information to the jury in a much more complete and meaningful form than could the almost clinical words of the doctors and nurses.").

---

[14]  Peters argues that the photographs were minimally probative because they showed what the victim "looked like after she was removed from the home, cleaned, and photographed in a hospital setting."  This argument is not persuasive.  Even if photographs of the victim in the home or upon her arrival to the hospital would have been *more* probative with respect to Peters's mental state and conduct, Rule 403 does not provide that only the *most* probative evidence may be admitted.  Here, even if the hospital photographs did not show the full extent of the victim's condition upon her removal from the home (e.g., her matted hair, the dried feces and urine on her body), they still provided the jury with important information about the extent of her physical deterioration and Peters's awareness and neglect of her condition.

[¶37] Moreover, the photographs were not likely to inflame the jury. The photographs showed the victim's body in a state of deterioration, but they were no more than gruesome than they needed to be, given the nature of the offense and the State's theory of the case. The photographs were taken only after the victim had been cleaned and dressed in a hospital gown; only one of the photographs showed the victim's face; and none of the photographs were "particularly shocking" in light of the other evidence presented at trial. *See, e.g.*, *State v. Allen*, 2006 ME 21, ¶¶ 15-17, 892 A.2d 456 (concluding that a court did not abuse its discretion by admitting a full-body photograph of a victim of child abuse, reasoning that "[a]ny case with allegations of child abuse evokes emotions" and that there was "nothing in the full-body picture, including the bandage and medical apparatus, that was particularly shocking"); *State v. Marquis*, 2017 ME 104, ¶ 31, 162 A.3d 818 (determining that a court did not abuse its discretion by admitting bloody photographs of a murder victim because "they [were] not overly or unnecessarily gruesome given the nature of the case" and because "the jury was already well aware of the extensive injuries that the victim suffered because it had heard the testimony of the medical examiner"); *cf. State v. Conner*, 434 A.2d 509, 513 (Me. 1981) (explaining that a photograph of a murder victim should have been excluded because it showed

the victim with a bloody chest and a "distorted face" and its probative value was "tenuous in the extreme").

[¶38]  Because the photographs of the victim in the hospital were highly probative and unlikely to cause undue prejudice, the court did not abuse its discretion by admitting them in evidence.  *See, e.g.*, *Aldrich*, 2026 ME 8, ¶¶ 25-27, 353 A.3d 987; *Marquis*, 2017 ME 104, ¶¶ 31-32, 162 A.3d 818.

The entry is:

Judgment affirmed.[15]

---

James P. Howaniec, Esq. (orally), Lewiston, for appellant James Peters

Aaron M. Frey, Attorney General, and Charles M. Boyle, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Oxford County Unified Criminal Docket docket number CR-2021-30078
FOR CLERK REFERENCE ONLY

---

[15] The docket record and the parties' briefs each indicate that Peters was sentenced to five years of incarceration, with all *but* two years suspended.  However, the judgment and commitment appears to indicate that the court suspended only two years of the sentence.  On remand, the trial court should correct the records to accurately reflect the sentence imposed.  *See* M.R.U. Crim. P. 50.